IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| WINDWARD AVIATION, INC.; NATIONAL UNION FIRE INSURANCE COMPANY OF PITTSBURGH, PA; ARCH INSURANCE CO.; STARNET INSURANCE CO.; NATIONAL FIRE AND MARINE INSURANCE CO., | ) ) ) ) ) ) ) | Civ. No. 10-00542 ACK-BMK |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| ROLLS-ROYCE CORPORATION; ROLLS-ROYCE ENGINE SERVICES-OAKLAND, INC.; JOHN DOES 1-10; JANE DOES 1-10; DOE PARTNERSHIPS 1-10; DOE CORPORATIONS 1-10; DOE ENTITIES 1-10, | ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

## ORDER DENYING DEFENDANTS' MOTION TO STRIKE AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### BACKGROUND[1]

This diversity action stems from the September 11, 2008, crash of Windward Aviation, Inc.'s ("Windward") McDonnell-Douglas 369D Helicopter ("subject helicopter"). According to Windward, the crash, which took place near Kaupo, Maui, resulted from engine failure following the sudden fracturing of the

---

[1] The facts as recited in this Order are for the purpose of disposing of the instant motions, and are not to be construed as findings of fact that the parties may rely on in future proceedings in this case.

defective "enhanced Fourth Stage Wheel" in the subject helicopter's engine turbine. Compl. ¶¶ 12-13. Defendant Rolls-Royce Corporation ("Rolls-Royce") manufactured the enhanced Fourth Stage Wheel and sold it to Windward, and Defendant Rolls-Royce Engine Services-Oakland, Inc. ("Rolls-Royce Engine Services"), installed it in the subject helicopter in March 2003. Id. ¶ 10; Defs.' CSF ¶¶ 1-2. In August 2006, Rolls-Royce Engine Services inspected the subject helicopter's engine, at which time, Windward alleges, it negligently failed to detect and/or repair the defective turbine wheel. Compl. ¶ 11. Windward claims that it purchased the enhanced Fourth Stage Wheel based on Rolls-Royce's representations that it would result in improved performance and would have 4550 Maximum Operating Hours and 6000 Maximum Cycles. 5/23/11 Shearer Decl. ¶ 4. At the time of the crash, the enhanced Fourth Stage Wheel had experienced only 2327.2 operating hours and 1763 cycles. Pls.' CSF ¶ 10; Pls.' Ex. G; Defs.' CSF ¶ 11.

Windward contends that Rolls-Royce was aware of a design problem with its enhanced turbine wheels as early as 2006 and as late as 2008. In June 2003, the enhanced "Third Stage Wheel," which is similar in design to the enhanced Fourth Stage Wheel, in one of Windward's helicopters failed mid-flight. Pls.' CSF ¶¶ 15-16. Windward states that "Rolls-Royce's own analysis [of the June 2003 crash] concluded that the design of its

2

enhanced power turbine created a situation where at the time of

start up to idle," stresses on the airfoil were large enough to

initiate low cycle fatigue ("LCF") cracks.  Id. ¶ 16 (citing

Pls.' Ex. I).  Windward further states that Rolls-Royce "believed

that the small [LCF] cracks could only develop into cracks large

enough to fracture the airfoils if the helicopter was operated in

the 75-88% N2 speed avoidance range," so it issued a commercial

bulletin in December 2006 "advising operators not to operate in

[this range] for more than 60 seconds, without explaining why."

Id. ¶ 18 (citing Pls.' Ex. J).  This commercial bulletin, like a

similar revised bulletin issued in August 2007, stated that the

"Speed Avoid Range . . . result[ed] from recent third-stage

turbine wheel Investigations."  Pls.' Exs. J at R2954, K at

R2962.  Windward contends that LCF cracks can be propagated into

high cycle fatigue ("HCF") fractures outside of this range, and

it directs the Court's attention to four helicopter crashes, in

addition to the September 11, 2008 crash, which ostensibly

involved "failures of the same part at the same location in the

same manner."  See id. ¶¶ 19-26 (citing Pls.' Exs. M, N, O, P, Q,

R, S, T).[2]

---

[2] Windward also points out that Rolls-Royce is now in the
process of redesigning the enhanced Fourth Stage Wheel.  Pls.'
CSF  ¶ 29.  The Court notes that none of Windward's arguments
appear to rely upon evidence of this redesign.  To the extent
that they do, such evidence appears to be inadmissible.  See Fed.
R. Evid. 407.

Windward and insurers National Union Fire Insurance
Company of Pittsburgh, PA; Arch Insurance Co.; Starnet Insurance
Co.; and National Fire and Marine Insurance Co. (collectively,
"Plaintiffs"), filed a complaint in the Circuit Court of the
Second Circuit, State of Hawai'i, against Rolls-Royce and Rolls-
Royce Engine Services (collectively, "Defendants") on August 17,
2010. Doc. No. 1. The complaint asserts ten claims against
Defendants: negligence, breach of warranty, intentional
misrepresentation, negligent misrepresentation, strict products
liability, breach of contract, unfair method of competition, res
ipsa loquitur, conversion, and subrogation. These claims are
based solely on property damage and business loss; apparently, no
one was injured in the subject helicopter's crash. See Compl.
¶ 15. Defendants removed the case to this Court on September 24,
2010. Doc. No. 1.

Two motions are now before the Court.[3/] First, on
March 16, 2011, Defendants filed a motion for summary judgment,
which was supported by a memorandum, a concise statement of facts
("Defs.' CSF"), declarations, and exhibits. Doc. Nos. 28-29. On
May 24, 2011, Plaintiffs lodged under seal a memorandum in

---

[3/] Throughout this Order, the Court will use the term
"Motion" in reference to the particular memorandum of law
submitted in support of the motion being discussed in that
section; the term "Opp'n" in reference to the opposition to that
motion; and the term "Reply" in reference to the reply in support
of that motion.

opposition to summary judgment, a concise statement of facts

("Pls.' CSF"), declarations, and exhibits.  See Doc. No. 50.[4]

On May 30, 2011, Defendants filed a reply in support of their

motion.  Doc. No. 55.  Second, on May 30, 2011, Defendants filed

a motion to strike Plaintiffs' concise statement of facts and a

declaration and the exhibits supporting it.  Doc. No. 56.

Plaintiffs filed an opposition to the motion to strike on May 31,

2011.  Doc. No. 57.

The Court held hearings on these motions on June 14,

2011, and June 15, 2011.  With the Court's permission, the

parties then filed the following supplemental materials.  On June

16, 2011, Plaintiffs submitted a statement in opposition to

Defendants' motion to strike, which included the deposition

transcript of Kathy Hunter, a Rolls-Royce engineer ("Pls.'

6/16/11 Supp'l Statement").  Doc. No. 69.  On June 17, 2011,

Plaintiffs filed a response in opposition to Defendants' motion

for summary judgment, which addressed Defendants' concise

statement of facts, set forth additional facts, and included a

---

[4] Three motions to seal have been filed with regard to
Plaintiffs' opposition to summary judgment and the documents
supporting that opposition.  Doc. Nos. 48, 53, 58.  The Court
denied the first two motions and granted the third.  Doc. Nos.
52, 54, 60.  Pursuant to the Court's June 2, 2011 Order granting
Rolls-Royce's motion to seal, Plaintiffs (1) filed in the public
record their opposition to summary judgment, with one page
redacted, and a number of the documents supporting it and (2)
filed under seal the redacted page of their opposition and a
number of other documents supporting it.  Doc. Nos. 62-63, 65.

number of exhibits and declarations ("Pls.' 6/17/11 Supp'l

Filing"). Doc. No. 72. On the same day, Defendants likewise

filed a supplemental statement of facts, also supported by

numerous exhibits and a declaration ("Defs.' 6/17/11 Supp'l

Filing"). Doc. No. 70.[5/]

## LEGAL STANDARD

The purpose of summary judgment is to identify and

dispose of factually unsupported claims and defenses. <u>See</u>

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323-24 (1986). Summary

judgment is therefore appropriate if "the movant shows that there

is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

"A party asserting that a fact cannot be or is genuinely disputed

must support the assertion," and can do so in either of two ways:

by "citing to particular parts of materials in the record,

including depositions, documents, electronically stored

information, affidavits or declarations, stipulations (including

those made for purposes of the motion only), admissions,

---

[5/] Both parties again filed motions to seal various
exhibits, and the Court granted these motions on June 20, 2011.
<u>See</u> Doc. Nos. 71-72, 75. Pursuant to the Court's June 20, 2011
Order granting the parties' motions to seal: (1) Plaintiffs filed
under seal Exhibit Y to Plaintiffs' 6/17/11 supplemental Filing
and Exhibit A to Plaintiffs' 5/30/11 opposition to Defendants'
motion to strike, (2) the Clerk of the Court removed from the
public record Exhibit A to Plaintiffs' 5/30/11 opposition to
Defendants' motion to strike, and (3) Defendants filed under seal
Exhibits F and G to Defendants' 6/17/11 Supplemental Filing. <u>See</u>
Doc. Nos. 57, 77-80.

interrogatory answers, or other materials"; or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

"A fact is 'material' when, under the governing substantive law, it could affect the outcome of the case. A 'genuine issue' of material fact arises if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n, 322 F.3d 1039, 1046 (9th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).[6] Conversely, where the evidence could not lead a rational trier of fact to find for the nonmoving party, no genuine issue exists for trial. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 289 (1968)).

The moving party has the burden of persuading the court as to the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323; Miller v. Glenn Miller Prods., 454 F.3d 975, 987 (9th Cir. 2006). The moving party may do so with affirmative evidence or by "'showing'—that is, pointing out to the district

---

[6] Disputes as to immaterial facts do "not preclude summary judgment." Lynn v. Sheet Metal Workers' Int'l Ass'n, 804 F.2d 1472, 1483 (9th Cir. 1986).

7

court—that there is an absence of evidence to support the nonmoving party's case." Celotex, 477 U.S. at 325.[7/]   Once the moving party satisfies its burden, the nonmoving party cannot simply rest on the pleadings or argue that any disagreement or "metaphysical doubt" about a material issue of fact precludes summary judgment.  See Celotex, 477 U.S. at 324; Matsushita Elec., 475 U.S. at 586; Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics, Inc., 818 F.2d 1466, 1468 (9th Cir. 1987). The nonmoving party must instead set forth "significant probative evidence" in support of its position.  T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (quoting First Nat'l, 391 U.S. at 290).  Summary judgment will thus be granted against a party who fails to demonstrate facts sufficient to establish an element essential to his case when that party will ultimately bear the burden of proof at trial. See Celotex, 477 U.S. at 322.

_____

[7/] When the moving party would bear the burden of proof at trial, that party must satisfy its burden with respect to the motion for summary judgment by coming forward with affirmative evidence that would entitle it to a directed verdict if the evidence were to go uncontroverted at trial.  See Miller, 454 F.3d at 987 (quoting C.A.R. Transp. Brokerage Co. v. Darden Rests., Inc., 213 F.3d 474, 480 (9th Cir. 2000)).  When the nonmoving party would bear the burden of proof at trial, the party moving for summary judgment may satisfy its burden with respect to the motion for summary judgment by pointing out to the court an absence of evidence from the nonmoving party. See id. (citing Celotex, 477 U.S. at 325).

When evaluating a motion for summary judgment, the court must construe all evidence and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. See T.W. Elec. Serv., 809 F.2d at 630–31.[8] Accordingly, if "reasonable minds could differ as to the import of the evidence," summary judgment will be denied. Anderson, 477 U.S. at 250–51.

## DISCUSSION

I.      **Defendants' Motion to Strike**

Defendants move to strike Plaintiffs' concise statement of facts, the May 23, 2011 declaration of Steven L. Goto and all of the exhibits attached thereto. The Court will address each of Defendants' arguments in turn.

A.      **Concise Statement of Facts**

Defendants argue that Plaintiffs' concise statement of facts violates LR 56.1. Motion at 2-3. The Court agrees. Local Rule 56.1 provides that:

> Any party who opposes [a motion for summary judgment] shall file and serve with his or her opposing papers a separate document containing a single concise statement that admits or disputes the facts set forth in the moving party's concise statement, as well as sets forth all material facts as to which it is contended there exists a genuine issue necessary to be litigated.

---

[8] At the summary judgment stage, the court may not make credibility assessments or weigh conflicting evidence. See Anderson, 477 U.S. at 249; Bator v. Hawaii, 39 F.3d 1021, 1026 (9th Cir. 1994).

9

LR 56.1(b). Plaintiffs' concise statement of facts fulfills

neither of these requirements. Instead of (1) "admit[ting] or

disput[ing] the facts set forth in [Defendants'] concise

statement" and (2) "set[ting] forth all material facts as to

which it is contended there exists a genuine issue necessary to

be litigated," Plaintiffs provide a list of "undisputed facts."

See Pls.' CSF ¶¶ 1-34. Moreover, Plaintiffs' opposition to the

motion to strike ignores this issue altogether.

Defendants request that Plaintiffs' statement be

stricken or that the facts contained in Defendants' concise

statement be deemed admitted. Motion at 2-3. There is authority

for both of these requests. See Simms v. University Health

Alliance, Civ. No. 09-00295 DAE-KSC, 2010 WL 1712001, at * (D.

Haw. Apr. 27, 2010) (striking a "Concise Statement" that

"submit[ted] only new factual assertions derived from Plaintiff's

own declaration and d[id] not respond to Defendant's [statement]

at all" where the plaintiffs had also filed a "Response" that

complied with LR 56.1); LR 56.1(g) ("For purposes of a motion for

summary judgment, material facts set forth in the moving party's

concise statement will be deemed admitted unless controverted by

a separate concise statement of the opposing party."); cf. Hughes

v. Mayoral, 721 F. Supp. 2d 947, 956 n.3 (D. Haw. 2010)

(recognizing that the plaintiff failed to follow LR 56.1(b), but

finding "that deeming all of Defendants' statements admitted [is] too harsh a sanction").

That said, the Court declines to strike Plaintiffs' statement or to deem the facts in Defendants' statement admitted. As noted, the Court has allowed both parties at their agreement to file supplemental materials, and Plaintiffs have submitted a supplemental statement of facts that complies with the Local Rules. Moreover, the Court recognizes that Defendants dispute many of Plaintiffs' "undisputed facts," and that such "facts" are simply Plaintiffs' characterization of the evidence. The Court does not consider these "facts" as evidence, but instead assesses the underlying evidence that Plaintiffs cite in support of such "facts."[9] Likewise, the Court assesses the underlying evidence that Plaintiffs cite in support of the "additional facts" set forth in their 6/17/11 Supplemental Filing.

## B. 5/23/11 Goto Declaration

Defendants ask the Court to strike the 5/23/11 Goto Declaration because Goto: (1) seeks to authenticate exhibits that he did not write or receive other than through discovery, and that he lacks personal knowledge of; (2) refers to statements made during the oral depositions of Defendants' witnesses, thereby acting as a "putative trial witness" and relying on

---

[9] The Court discusses below why it does not strike the 5/23/11 Goto Declaration or Plaintiffs' exhibits.

hearsay; and (3) offers "conclusions that have no references in the record." Motion at 3-6. Although some of Defendants' arguments have traction, the Court declines to strike the 5/23/11 Goto Declaration.

First, that the 5/23/11 Goto Declaration may have failed to properly authenticate certain exhibits does not persuade the Court that the declaration itself should be stricken. Second, Goto apparently described statements made during the oral depositions of Steven L. Edney, Ph.D., and Kathy Hunter, rather than providing the actual deposition transcripts, because those transcripts were not available as of May 23, 2011. See 5/23/11 Goto Decl. ¶¶ 26-31; Opp'n at 8-9. Plaintiffs have now provided portions of Edney's and Hunter's deposition transcripts. Opp'n Ex. A; Pls.' 6/16/11 Supp'l Statement Ex. B. The Court does not consider Goto's characterization of Edney's or Hunter's testimony as evidence, but instead assesses the deponents' statements themselves. For this reason, the Court need not strike the 5/23/11 Goto declaration on the basis that it "contains conclusions that have no references in the record." Motion at 5.

**C.      Exhibits**

Defendants argue that all of Plaintiffs' exhibits should be stricken because they are not properly authenticated. Motion at 6-8. In light of the additional information contained

12

in Plaintiffs' opposition to the motion to strike and Plaintiffs'
6/17/11 Supplemental Filing, the Court is unpersuaded.

First, as Plaintiffs point out, Defendants do not deny
that their witnesses authenticated most of Plaintiffs' exhibits,
which Defendants themselves produced in discovery. Opp'n at 4;
see Maljack Prods., Inc. v. GoodTimes Home Video Corp., 81 F.3d
881, 889 n.12 (9th Cir. 1996) (deeming authentic documents that
were produced by a party in discovery and offered in opposition
to summary judgment by the party-opponent); Del Campo v. Am.
Corrective Counseling Serv., Inc., 718 F. Supp. 2d 1116, 1123
n.10 (N.D. Cal. 2010) ("Since Defendants do not specify any
reason to doubt the authenticity of documents that they
themselves produced in discovery, the Court finds the documents
properly authenticated under Fed. R. Evid. 901.").[10]

Moreover, the portions of Edney's deposition transcript
now before the Court make clear that Exhibits D, E, F, J, K, Q,
S, U, V, and W were indeed authenticated by Edney, Rolls-Royce's
Fed. R. Civ. P. 30(b)(6) witness. See Opp'n at 4-8; Opp'n Ex. A.
Likewise, Hunter's deposition transcript, which is now before the
Court, makes clear that Exhibits A, I, M, N, P, R, and T were

---

[10] Indeed, "in moving to seal the Rolls-Royce documents
identified [by Plaintiffs] as Exhibits, Rolls-Royce authenticated
Exhibits A, D, E, F, I, J, K, M, N, P, R, T, U, V, and W." Pls.'
6/16/11 Supp'l Statement at 3 (citing Doc. No. 58-2).

authenticated by Hunter.  <u>See</u> Pls.' 6/16/11 Supp'l Statement Ex.
B.

Second, although Goto's initial authentication of
Exhibits B, C, G, H, L, O, and X may not have been proper, <u>cf.</u>
<u>Orr v. Bank of America, NT & SA</u>, 285 F.3d 764, 774 (9th Cir.
2002) (holding that an attorney who was present at a deposition
could not authenticate a transcript of the deposition by stating
that it was "a true and correct copy"), the May 31, 2011
declarations of Goto and Donald Shearer, a Windward vice
president, properly authenticated these exhibits.  <u>See</u> 5/31/11
Goto Decl. ¶¶ 4, 12 (authenticating Exhibits B and O); 5/31/11
Shearer Decl. ¶¶ 3-7 (authenticating Exhibits C, G, H, L, and X).

In sum, the Court will not strike Plaintiffs' concise
statement of facts, the 5/23/11 Goto Declaration, or any of the
exhibits attached thereto.

## II.        Defendants' Motion for Summary Judgment

Plaintiffs' complaint asserts ten claims against
Defendants: negligence (Claim I), breach of warranty (Claim II),
intentional misrepresentation (Claim III), negligent
misrepresentation (Claim IV), strict products liability (Claim
V), breach of contract (Claim VI), unfair method of competition
(Claim VII), res ipsa loquitur (Claim VIII), conversion (Claim
IX), and subrogation (Claim X).  The Court will address these

claims in the order in which Defendants' motion for summary judgment addresses the claims.

**A.      Negligence (Claim I) and Strict Products Liability (Claim V)**

Defendants argue that Plaintiffs' negligence and strict products liability claims are barred by the economic loss rule as a matter of law.  Motion at 7-10.  The Court is unpersuaded, and finds that Defendants are not entitled to summary judgment with regard to Plaintiffs' negligence and strict products liability claims.[11]

The economic loss rule, which Hawai'i has adopted, provides that "a manufacturer in a commercial relationship has no duty under either a negligence or strict products liability theory to prevent a product from injuring itself." <u>State ex rel. Bronster v. U.S. Steel Corp.</u>, 82 Hawai'i 39, 919 P.2d 294, 301 (1996).  "'When a product injures only itself the reasons for imposing a tort duty are weak and those for leaving the party to its contractual remedies are strong. . . . Damage to a product itself is most naturally understood as a warranty claim.'" <u>Id.</u> at 40, 919 P.2d at 302 (quoting <u>East River S.S. Corp. v.</u>

---

[11] The Court notes that Defendants argue that they are entitled to summary judgment as to the negligence and strict liability claims only on the ground that such claims are barred by the economic loss rule; they do not argue that these claims are time-barred or that they otherwise fail on the merits.  Also, Plaintiffs assert their negligence claim against both defendants, but their strict products liability claim only against Rolls-Royce.

Transamerica Delaval, Inc., 476 U.S. 858, 871-72 (1986)).

However, when an allegedly defective product "cause[s] damage to

other property, the economic loss doctrine does not apply."

Kawamata Farms, Inc. v. United Agri Prods., 86 Hawai'i 214, 254,

948 P.2d 1055, 1095 (1997).

To determine what constitutes "the product" and what

constitutes "other property" for purposes of the economic loss

rule, the Court must analyze the "object of the bargain" between

the parties. See Kawamata, 86 Hawai'i at 254, 948 P.2d at 1095;

Sea-Land Serv., Inc. v. Gen. Elec. Co., 134 F.3d 149, 153 (3d

Cir. 1998); Exxon Shipping Co. v. Pacific Res., Inc., 835 F.

Supp. 1195, 1199-1202 (D. Haw. 1993).  Although this inquiry is

usually a legal question of contract interpretation, see

Petroleum Helicopters, Inc. v. AVCO Corp., 930 F.2d 389, 393 n.9

(5th Cir. 1991), factual determinations based on extrinsic

evidence are arguably necessary where "the court is not presented

with sufficient evidence of the parties' contract."  Exxon, 835

F. Supp. at 1200; see, e.g., Onsite/Molokai Ltd. P'ship v. Gen.

Elec., 838 F. Supp. 1390, 1394-95 (D. Haw. 1992).

The issue here is whether the allegedly defective

enhanced Fourth Stage Wheel constitutes the same product as the

subject helicopter and its component parts.  If it does

constitute the same product, then the economic loss rule

prohibits recovery in tort for any damage caused by the enhanced

Fourth Stage Wheel to itself <u>as well as</u> to the subject helicopter and its components.

Defendants rely on <u>Virginia Surety Co. v. American Eurocopter Corp.</u>, 955 F. Supp. 1213 (D. Haw. 1996), which found that a helicopter and its engine "constitute[d] a single product for the purposes of the economic loss doctrine," to argue that the subject helicopter and the enhanced Fourth Stage Wheel constitute a single product. <u>See id.</u> at 1216; Motion at 8-9. Unlike here, however, the helicopter and engine in <u>Virginia Surety</u> had been purchased as a complete unit that was alleged to include a defective fitting. <u>See id.</u> at 1215. Accordingly, <u>Virginia Surety</u> involved a fairly straightforward application of the "integrated products rule." Under this rule, which is a corollary to the economic loss rule, a product supplied as an integrated package is properly regarded as a single unit that includes its component parts. <u>See Irish Venture, Inc., v. Fleetguard, Inc.</u>, 270 F. Supp. 2d 84, 85 (D. Mass. 2003) (citing <u>East River</u>, 476 U.S. at 867). Although the engine in <u>Virginia Surety</u> was overhauled after its purchase and the power turbine was later replaced, the plaintiff there alleged that the original defective fitting was never replaced as promised, or that a defective fitting, like the original, was re-installed in the engine upon the turbine's replacement. Defendants' reliance on <u>Virginia Surety</u> is misplaced because Plaintiffs do not allege

17

that Windward purchased a helicopter that included defective components.

Similarly unavailing to Defendants is The Association of Apartment Owners of Newton Meadows v. Venture 15, Inc., 115 Hawai'i 232, 167 P.3d 225 (2007). Venture 15 found that even if allegedly defective floor slabs used in the construction of a condominium complex caused "cracked floor tiles, demising walls, skewed door jambs and windows, and [termite] damage," this "d[id] not constitute damage to 'other property.'" Id. at 295, 167 P.3d at 288. Although Defendants are correct that these "slabs were constructed under separate contract from the rest of the complex by one of several defendants," similar to the separately purchased subject helicopter and enhanced Fourth Stage Wheel, Venture 15 is inapposite. See Reply at 4. The economic loss rule distinguishes between (1) separately purchased or assembled components that are integrated to form a complete product sold to a consumer and (2) separately purchased components that are integrated into a product that the consumer already owns. See Exxon, 835 F. Supp. at 1201 & n.4; cf. Saratoga Fishing Co. v. J.M. Martinac & Co., 520 U.S. 875, 884 (1997) ("[There is] a distinction between components added to a product by a manufacturer before the product's sale to a user, and those items added by a user to the manufactured product." (internal citations

omitted)). In the latter situation, the applicability of the
economic loss rule depends on the object of the parties' bargain.

In Exxon, the court discussed how "the analysis in the
'object of the bargain' test is more than a mechanical or
formalistic determination of whether the injuring and injured
components were sold under the umbrella of the same contract."
835 F. Supp. at 1201. It stated that this analysis is "a fluid
one, and does not require that the entire product be supplied
under a single, umbrella contract. Even a multi-party purchase
arrangement, where the purchaser acts as its own general
contractor in a series of coordinated transactions with several
vendors, does not upset the analysis." Id. By contrast, Exxon
noted that:

> The law is less settled with regard to the situation
> where a significant new component is acquired later and
> added to an existing product. Some courts have held
> that tort recovery is precluded in such a case. See
> McConnell v. Caterpillar Tractor Co., 646 F. Supp.
> 1520, 1525-26 (D.N.J. 1986) (tort recovery precluded
> where new crankshaft damaged engine). In this court's
> view, the better approach is to permit tort recovery
> under such circumstances. See Mays Towing Co., Inc. v.
> Universal Machinery Co., 755 F. Supp. 830, 833 (S.D.
> Ill. 1990) (tort recovery allowed where new engine
> damaged vessel).

Id. at 1201 n.4.

Exxon, which did not involve a "situation where a
significant new component is acquired later and added to an
existing product," held that the economic loss rule barred
recovery of damages to a mooring even though its components,

19

including two chains, one of which was defective, were purchased separately but concurrently as parts of the product. <u>Id.</u> at 1201-02. According to the court, the components were purchased "as part of a coordinated series of transactions leading to the acquisition of a completed [mooring]." <u>Id.</u> at 1201. Further, the court found it irrelevant that the defective chain may have been the chain initially intended as a spare (and purchased prior to the mooring's completion). <u>Id.</u> The court noted that "[a]n integrated product may have any number of components replaced with spare parts in the ordinary course of events," and "[t]o hold that these parts are 'other property' would lead to absurd results." <u>Id.</u>

In <u>Sea-Land</u>, the Third Circuit extended the integrated product rule to include "part[s] originally supplied with the product" <u>as well as</u> subsequently purchased replacement parts. <u>See</u> 134 F.3d at 153-54. Citing <u>Exxon</u>, <u>Sea-Land</u> noted that "all commercial parties are aware that replacement parts will be necessary." <u>Id.</u> at 154. <u>Sea-Land</u> continued:

> It is a common commercial practice for the parties to a transaction to contemplate the integration of replacement parts subsequent to a purchase. In the instant case, it was expected that all the replacement parts [would] eventually have to be integrated into the engine. The GE connecting rod was purchased to be installed and to become integrated with the GE engine. It is a component of that engine; it has no use to Sea-Land otherwise. Moreover, in purchasing and installing replacement parts, the parties can, as with the original purchase, negotiate the terms of the sale and of any warranties.

Id.  Importantly, the Third Circuit followed Exxon in holding
that "the product" does not include "additional parts that are
not encompassed in the original bargain but are subsequently
acquired."  Id. at 153.[12/]

Applying the framework established by these
authorities, which the Court finds would be followed by the
Supreme Court of Hawai'i, the Court finds that Defendants have
not established that the economic loss rule bars Plaintiffs'
negligence and strict products liability claims as a matter of
law.  To begin with, the Court must rely on extrinsic evidence
regarding the object of the parties' bargain because neither
party has submitted to the Court the contracts at issue here.
See Exxon, 835 F. Supp. at 1199-1200; Onsite/Molokai, 838 F.
Supp. at 1394.  In particular, Defendants, who have the burden of
persuading the court as to the absence of a genuine issue of

_____

[12/] Some courts have declined to follow Sea-Land's holding
that subsequently purchased replacement parts are integrated into
"the product" for purposes of the economic loss rule.  Compare
Irish Venture, 270 F. Supp. 2d at 86 (noting that the Supreme
Court's holding in Saratoga Fishing "suggest[s] that replacement
parts should be distinguished from the original components that
come with a finished product" and allowing tort recovery for
damages to a fishing vessel's engine caused by an allegedly
defective replacement oil filter), with Agrotors, Inc. v. Bell
Helicopter Textron, Inc., No. Civ.A.03-04345, 2004 WL 2039954, at
*1-4 (E.D. Pa. Sep. 9, 2004) (finding that an allegedly defective
replacement oil drain valve constituted the same product as the
helicopter it was a part of, thus precluding tort recovery for
damage to the helicopter, because the valve was one of the
helicopter's many component parts that "would inevitably need
replacement").

material fact, have not submitted any evidence supporting their view of the object of the parties' bargain.[13/]

The parties' initial papers implicitly suggested that Windward purchased the subject helicopter, including its hull, engine, and turbine, in February 2001 or earlier. See, e.g., Pls.' CSF ¶ 3 ("The power turbine used on Windward Aviation, Inc.'s Hughes 369D was purchased by Windward Aviation on February 21, 2001." (citing Pls.' Ex. C)). At the hearing, neither party's counsel was aware when Windward purchased the subject helicopter.

The parties' supplemental papers, however, suggest that Windward: (1) bought the subject engine (i.e., the engine that was in the subject helicopter when it crashed) from J.M. Martinac Shipbuilding Corporation in August 2000; (2) bought the subject turbine assembly, which contained non-enhanced Rolls-Royce Third and Fourth Stage Wheels, from E. M. Heli-Logistics in February 2001; (3) bought an "improvement package" containing enhanced Rolls-Royce Third and Fourth Stage Wheels from Rolls-Royce in March 2003, and at the same time had Rolls-Royce Engine Services install the package during a heavy maintenance inspection; (4) had the subject turbine assembly with the enhanced turbine wheels installed into the subject engine in April 2003; (5) bought the

_____

[13/] The Court notes that in their reply memorandum, Defendants assert that "the product sought and used by [Windward] is the damaged helicopter." Reply at 2-3.

22

subject hull from Skyward LLC in July 2006; and (6) had the

subject engine, which contained the subject turbine assembly with

the enhanced turbine wheels, installed into the subject hull on

November 16, 2007.  See 5/23/11 Shearer Decl. ¶ 4; 6/17/11

Shearer Decl. ¶¶ 5-9, 11-12, 15-16, 18; Pls.' Ex. C.

The record also indicates that as of the August 2,

2006, heavy maintenance inspection performed by Rolls-Royce

Engine Services, the subject turbine assembly fitted with

enhanced turbine wheels had experienced 1745.6 operating hours

and 1363 cycles.  Id. ¶ 17; Pls.' Ex. H.  It is unclear which

helicopter(s) the subject engine with the enhanced turbine wheels

was operated in from 2003 to August 2006, and from whom that

helicopter(s) was purchased.[14]  It is also unclear which

helicopter(s) the subject engine with the enhanced turbine wheels

was operated in - and for how many hours/cycles the turbine

wheels were operated - from August 2006 until November 2007, when

this engine with the enhanced turbine wheels was installed in the

subject hull.[15]

_____

[14] By "helicopter," the Court means the entire helicopter
unit, including the hull, the engine, the turbine assembly, the
turbine wheels, and so forth.

[15] It appears from the record that the enhanced turbine
wheels had experienced the same number of operating hours and
cycles on November 16, 2007, as it had experienced on August 2,
2006, the date of the heavy maintenance inspection; thus
indicating it had not been operated during the interim.  See
Pls.' Exs. G, H.  Although this seems questionable, neither party
(continued...)

Given that the subject helicopter was composed of parts
that Windward purchased over a period of seven years from at
least four different entities, only one of which appears to have
been Rolls-Royce, the Court cannot find, as a matter of law, that
the object of Windward and Rolls-Royce's March 2003 bargain for
the enhanced Fourth Stage Wheel encompassed the hull and engine
and turbine (apart from the enhanced turbine wheels purchased
from Rolls-Royce, of course) that were ultimately damaged on
September 11, 2008.

Indeed, Windward bought the subject helicopter's engine
three years <u>before</u> it bought the enhanced Fourth Stage Wheel;
while it bought the subject helicopter's hull three years <u>after</u>
it bought the enhanced Fourth Stage Wheel.  <u>Cf.</u> <u>Indemnity Ins.</u>
<u>Co. of North America v. American Eurocopter, LLC</u>, No. 1:03CV949,
2005 WL 1610653, at *16 (M.D.N.C. July 8, 2005) (allowing tort
recovery for damage to a helicopter where there was "no reason to
conclude that the original sale of the helicopter in 1992 covered
the separate sale of an [allegedly defective] overhauled gearbox
[from] a separate entity eight years later"); <u>Irish Venture</u>, 270
F. Supp. 2d at 86 ("The object of Irish Venture's bargain with
Rose's Oil was a [replacement] oil filter.  The filter, once
installed, caused damage not only to itself . . . but also to the

_____

[15]/(...continued)
offers an explanation.

24

engine, which was purchased in an entirely separate bargain, and cannot be said to have been any part of the deal struck between Irish Venture and Rose's Oil."); Transco Syndicate #1, Ltd v. Bollinger Shipyards, Inc., 1 F. Supp. 2d 608, 612 (E.D. La. 1998) ("The object of parties' contract was two 'Good Runner' engines. The [tug boat] was a separate product that was purchased through the stream of commerce from a different supplier at a different point in time. Therefore, any damage that those two engines caused to the [tug boat] is harm to 'other property.'" (citing Mays Towing, 755 F. Supp. at 833)).[16]

---

[16] See also Ice Fern Shipping Co. v. Golten Serv. Co., No. 1:04-CV-20741, 2005 WL 3692840, at *2-3 (S.D. Fla. Mar. 22, 2005) (allowing tort recovery for damage to a ship's engine caused by the allegedly negligent overhaul of the engine governor "because only the governor was covered under the terms of the contract"); Mountain West Helicopter, LLC v. Kaman Aerospace Corp., 310 F. Supp. 2d 459, 461-62, 466 (D. Conn. 2004) (allowing tort recovery for damage to a helicopter caused by a defective clutch assembly that was replaced two years after the helicopter's purchase at the urging of the helicopter manufacturer); Lease Navajo v. Cap Aviation, Inc., 760 F. Supp. 459 (E.D. Pa. 1991) (allowing tort recovery because "the engines and the allegedly defective components were not purchased as integrated units. [Rather,] Cap Aviation purchased a component part only, consistent with Avco Lycoming's technical manual, which it then installed in an engine manufactured by Avco Lycoming"); cf. Venture 15, 115 Hawai'i at 295, 167 P.3d at 286-87 (relying on a case where "'no recovery [was] permitted under strict liability theory for building damage caused by defective bricks because plaintiffs purchased completed apartment complex and not a load of bricks'" and another case that rejected "'homeowners' argument that damages caused to a condominium by defective concrete was damage to other property because plaintiffs purchased finished homes, not component parts'" (internal citations omitted)).

Similarly, the Court cannot find, as a matter of law, that the economic loss rule applies on the ground that Windward "act[ed] as its own general contractor in a series of coordinated transactions with several vendors" such that "the object of the bargain is the acquisition of the completed product, even though this object is realized via a series of coordinated transactions with several sellers." Cf. Exxon, 835 F. Supp. at 1200-01. The evidence now before the Court does not indicate that Windward's purchases of components from 2000 to 2007 were "coordinated" in any fashion.

Moreover, at the time that Windward purchased the subject engine from a third party, Windward appears not to have known that Rolls-Royce had developed an enhanced Fourth Stage Wheel. See 6/17/11 Shearer Decl. ¶ 6 (stating that Windward purchased the subject engine from J.M. Martinac Shipbuilding Corporation on August 30, 2000); Id. ¶ 9 (stating that on or about November 28, 2000, Windward received a commercial service letter and commercial engine bulletin regarding Rolls-Royce's enhanced turbine wheels); Pls.' Ex. D (Rolls-Royce's November 28, 2000 commercial service letter offering "a special pricing incentive" on its "power turbine product improvement package").[17]

[17] Also, Plaintiffs' counsel stated at the hearing that Windward first learned about the enhanced Fourth Stage Wheel in November 2000, from Rolls-Royce's commercial service letter (although Plaintiffs have not submitted any declarations
(continued...)

Consequently, it is questionable whether the enhanced turbine wheel fell within the object of the bargain with the purchase of the engine itself.

Finally, unlike the spare chain in <u>Exxon</u> and the connecting rod in <u>Sea-Land</u>, the Court cannot find, as a matter of law, that the enhanced Fourth Stage Wheel was simply a "replacement" part that the parties contemplated or expected would be necessary. There is no evidence that Windward purchased the enhanced Fourth Stage Wheel in 2003 because the non-enhanced Fourth Stage Wheel had worn out, or was otherwise in need of replacement. To the contrary, the record indicates that when Windward "replaced" its non-enhanced Fourth Stage Wheel, that wheel was still functional, and indeed had 1,577.2 hours remaining on its service life. <u>See</u> 6/17/11 Shearer Decl. ¶ 13; Defs.' Ex. B1 at E0179; Pls.' Ex. E at R4512.[18] The record further suggests that Windward purchased the enhanced Fourth Stage Wheel based on Rolls-Royce's representations that the "power turbine product improvement package" would result in improved performance. <u>See</u> 6/17/11 Shearer Decl. ¶¶ 9, 11.

---

[17] (...continued)
supporting this assertion).

[18] By contrast, when Windward replaced its non-enhanced Third Stage Wheel at the same time, that wheel was cracked. <u>See</u> Defs.' Ex. B1 at E0179. And when Windward replaced its other two turbine wheels at that time, those wheels had less than 25 hours remaining on their 1775 hour service life. <u>See</u> <u>id.</u>; 6/17/11 Shearer Decl. ¶ 14.

Also, the enhanced Fourth Stage Wheel was sold under a different part number than the non-enhanced Fourth Stage Wheel. See Pls.' Ex. E at R4512; Pls.' 6/17/11 Supp'l Filing ¶ 12. Accordingly, Defendants cannot show that the replacement part rules employed in Sea-Land and Exxon apply here as a matter of law. Cf. Sea-Land, 134 F.3d 153 ("[W]e distinguish from the product additional parts that are not encompassed in the original bargain but are subsequently acquired. These should not be integrated."); Exxon, 835 F. Supp. at 1201 n.4 (stating that tort recovery should be permitted "where a significant new component is acquired later and added to an existing product").

In sum, Defendants fail to show that the economic loss rule entitles them to summary judgment as to Plaintiffs' negligence and strict products liability claims.[19]

**B.        Breach of Warranty (Claim II)**

Defendants argue that Plaintiffs' express warranty claims fail as a matter of law and, in any event, have expired, and that Plaintiffs' implied warranty claims are time-barred. Motion at 10-12. The Court agrees that Plaintiffs' express warranty claims fail as a matter of law, but finds that

---

[19] In light of the Court's finding, the Court need not address Plaintiffs' argument that the exceptions to the economic loss rule discussed in Venture 15 apply here. See Opp'n at 27-29; Venture 15, 115 Hawai'i at 295, 167 P.3d at 288.

Plaintiffs' implied warranty claims against Rolls-Royce survive summary judgment.[20/]

## 1.        Express Warranty Claims

Plaintiffs do not dispute that at the time of the subject helicopter's crash, the enhanced Fourth Stage Wheel's express two year or 1,000 hour warranty had expired. Accordingly, any claim based on this express warranty fails as a matter of law.  The enhanced Fourth Stage Wheel was installed in March 2003 and serviced in August 2006, both more than two years before the September 11, 2008 crash; and the enhanced Fourth Stage Wheel logged 2327.2 hours by the time of the crash, well more than double the number of hours it was expressly warranted for.  See Pls.' CSF ¶ 10; Defs.' CSF ¶¶ 2-3, 6, 11; Defs.' Ex. B2.

Plaintiffs instead argue that "Rolls-Royce affirmatively represented to Windward Aviation that the enhanced fourth stage wheel was both (a) FAA certified and (b) would have a service life of 4,550 Operating Hours and 6,000 Maximum Cycles, the same as the non-enhanced version of the fourth stage wheel." Opp'n at 30.[21/]  According to Plaintiffs, "these specific

_____

[20/] Defendants argue that they are entitled to summary judgment as to the breach of implied warranty claims only on the ground that such claims are time-barred; they do not otherwise contest the merits of such claims.

[21/] Although Plaintiffs' opposition memorandum discusses
(continued...)

'affirmations of fact' and 'description[s] of the goods'
constitute an express warranty that the goods 'shall conform' to
the affirmation or description." Id. at 31 (citing H.R.S.
§ 490:2-313).

Plaintiffs' argument is unconvincing. First, as
Plaintiffs' opposition memorandum and concise statement of facts
acknowledge, the enhanced Fourth Stage Wheel was FAA certified.
Id. at 13; Pls.' CSF ¶ 7. Although Plaintiffs complain that the
FAA certified Rolls-Royce's life limits based on a report in
which the enhanced Fourth Stage Wheel was not actually tested to
4550 hours and 6000 cycles, this is beside the point.
Rolls-Royce represented to Windward that the FAA had certified
the life limits in question, and apparently the FAA had.[22/]

Second, Plaintiffs do not persuasively controvert
Defendants' offer of proof that "service life numbers identify
the outside time period when a part must be retired, and are not
a warranty from the manufacture[r]." See Reply at 8; Defs.' CSF

_____

[21/](...continued)
Rolls-Royce's purported representation that the enhanced Fourth
Stage Wheel "would have a service life of 4,550 Operating Hours
and 6,000 Maximum Cycles," the exhibit Plaintiffs cite contains a
representation only as to "Maximum Operating Hours." See Opp'n
at 30; Pls.' Ex. E at R4512 (emphasis added).

[22/] Also, because Rolls-Royce's certification report
explicitly informed the FAA that it had tested its enhanced
Fourth Stage Wheel to 4162 cycles only, the Court is unpersuaded
by Plaintiffs' suggestion that Rolls-Royce pulled the wool over
the FAA's eyes in this regard. See Motion at 13.

¶ 18; Hunter Decl. ¶ 4; <u>see also</u> Pls.' Ex. E at R4505 (operation and maintenance manual section entitled "Airworthiness Limitations Description"). And as Defendants argue, the plain meaning of the word "maximum" suggests that designating a part's "maximum operating hours" and "maximum cycles" is not warranting that the part will reach such maximum hours or cycles. <u>See</u> Reply at 8 (quoting the Black's Law Dictionary definition of "maximum" as the "highest or greatest amount").

The Court finds persuasive the reasoning of <u>HDM Flugservice GmbH v. Parker Hannifin Corp.</u>, 332 F.3d 1025 (6th Cir. 2003), which involved strikingly similar facts as those now before the Court. In <u>HDM</u>, the Sixth Circuit found, as a matter of law, that a "statement of service life hours in [a helicopter landing gear] maintenance manual [did not] create[] an express warranty that the aft cross tube [of the landing gear] would last at least 3,500 hours." <u>Id.</u> at 1035. <u>HDM</u> reasoned as follows:

> There is no reasonable argument that the section of the manual titled "<u>AIRWORTHINESS LIMITATIONS</u>" states a minimum life expectancy, as opposed to the maximum life expectancy, of a component. The first paragraph of the section explains that the service hours lists are "mandatory landing gear component replacement times." The specified service life hours, therefore, clearly establish the maximum flight hours a component can be used before it must be replaced, not the minimum number of hours that the component can be used.

<u>Id.</u> at 1033, 1035. This reasoning is equally applicable here. <u>See</u> Pls.' Ex. E at R4505 (operation and maintenance manual section entitled "Airworthiness Limitations Description"). In

sum, Plaintiffs' express warranty claims fail as a matter of law.[23]

## 2.        Implied Warranty Claims

Defendants argue that Plaintiffs' implied warranty claims are barred by the four year statute of limitations set forth in H.R.S. § 490:2-725(1).  Motion at 10-11; see Holliday v. Bell Helicopters Textron, Inc., 747 F. Supp. 1396, 1398 (D. Haw. 1990) ("Warranty claims under state law are governed by a four year statute of limitations set out at Hawaii Rev. Stat. § 490:2-725(1), which covers breaches of contracts for sale."); Larsen v. Pacesetter Sys., Inc., 74 Hawai'i 1, 11-12, 837 P.2d 1273, 1279-80 (1992) (holding that H.R.S. § 490:2-725 applies to breach of implied warranty claims).  This section further provides, in pertinent part:

> A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach.  A breach of warranty occurs when tender of delivery is made, except that where a warranty explicitly extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

---

[23] The Court need not address Plaintiffs' argument that the limitations period on their express warranty claims has not run. See Opp'n at 31-37.  Defendants do not argue that Plaintiffs' express warranty claims are time-barred, and for the reasons discussed, these claims fail on the merits.

H.R.S. § 490:2-725(2).[24/]  Plaintiffs respond that their implied

warranty claims survive the four-year statute of limitations

pursuant to the doctrines of equitable and fraudulent tolling.

Opp'n at 33-37.[25/]

The Court finds that Plaintiffs' implied warranty

claims against Rolls-Royce remain actionable because there is a

"possibility that [P]laintiffs could show lulling" on Rolls-

Royce's part, which "is sufficient to avoid summary disposition

on [Defendants'] statutes of limitation defenses." Cunha v. Ward

Foods, Inc., 501 F. Supp. 830, 836 (D. Haw. 1980).  A plaintiff

can show that equitable tolling based on "lulling" is appropriate

where "'it appears that [a defendant] has done anything that

would tend to lull the plaintiff into inaction, and thereby

---

[24/] Plaintiffs filed their complaint on August 17, 2010, more
than four years after Rolls-Royce Engine Services's August 2,
2006 servicing and Rolls-Royce's March 29, 2003 delivery of the
enhanced turbine kit.

[25/] Plaintiffs also cite Baloq v. Center Art Gallery-Hawaii,
Inc., 745 F. Supp. 1556 (D. Haw. 1990) for the proposition that
the limitations period should not commence "until Windward had
fair notice that Rolls-Royce had sold it defective goods." See
Opp'n at 33-35.  The Court is unpersuaded, however, because Baloq
made clear that its expansive application of the discovery rule
"applie[d] narrowly to artwork as it comes under the regulation
of the U.C.C." Baloq, 745 F. Supp. at 1570-71.  This court has
subsequently rejected attempts to circumvent H.R.S. § 490:2-
725(2)'s plain language that "[a] cause of action accrues when
the breach occurs, regardless of the aggrieved party's lack of
knowledge of the breach." See In re Hawaii Federal Asbestos
Cases, 854 F. Supp. 702, 708-09 (D. Haw.  1994) (refusing to
apply the discovery rule in the context of express and implied
warranty claims based on latent personal injuries).

permit the limitation prescribed by the statute to run against him.'" <u>Mauian Hotel, Inc. v. Maui Pineapple Co.</u>, 52 Hawai'i 582, 570-71, 481 P.2d 310, 315 (1971) (citation omitted); <u>Cunha</u>, 501 F. Supp. at 836.

In support of their argument that Rolls-Royce lulled Plaintiffs into inaction, Plaintiffs contend that:

> as early as 2004, or as late as January 2008, Rolls-Royce was aware that its enhanced power turbines were subject to initiating LCF cracks at startup, in violation of 14 CFR 33.27(a). However, instead of <u>notifying</u> its customers of the defect and agreeing to be responsible for a monitoring and replacement program, in December 2006, Rolls-Royce issued CEB A-1400, advising operators <u>not to operate</u> in the 75-88% N2 speed avoidance range, in order to avoid <u>propagating</u> the LCF initiated cracks into larger failures.

Opp'n at 36 (internal citation omitted). Plaintiffs further argue that while Rolls-Royce "has been advising the FAA and NTSB of the deficiencies in its enhanced power turbines, as to its customers, Rolls-Royce has engaged only in a campaign of obfuscation and deception designed to blame operators for Rolls-Royce's design defects." <u>Id.</u> at 36-37. Based on the record before the Court, there is a possibility that Plaintiffs could show that Rolls-Royce lulled Plaintiffs into inaction.[26/]

Rolls-Royce's December 2006 and August 2007 "Commercial Engine Bulletins" informed operators that its warning to avoid

---

[26/] The Court notes that Plaintiffs' breach of implied warranty claims and lulling arguments do not turn on whether the enhanced Fourth Stage Wheel violates 14 C.F.R. § 33.27(a). The Court addresses this regulation <u>infra</u> Section II.C.

steady state operation in the 75-88% N2 speed avoid range

"result[ed] from recent third-stage turbine wheel

Investigations."  Pls.' Exs. J at R2954, K at R2962.  These

bulletins also stated that if "a turbine is operated in excess of

60 seconds in the speed avoid range in any one event, the turbine

unit must be removed from service."  Pls.' Exs. J at R2956, K at

R2964.  These bulletins did <u>not</u>, however, inform operators that

the blades on the enhanced Third Stage Wheel were subject to

"large compressive stresses [that] go beyond yield during startup

and are of sufficient magnitude to initiate low cycle fatigue

cracks," which could eventually lead to HCF failure and thus

helicopter crashes.  <u>See</u> Pls.' Exs. I at R425-26, J-K.  Granted,

Rolls-Royce had not released its November 2007 report, which

reached this finding regarding LCF crack initiation, when it

issued the bulletins.  But Plaintiffs may be able to show that

Rolls-Royce was already aware of the LCF crack problem as of

December 2006 and/or August 2007.  After all, Rolls-Royce

apparently knew enough by that time to warn operators to avoid

steady state operation in the 75-88% N2 speed avoid ranges.

Moreover, in a March 12, 2009 letter to Windward,

Rolls-Royce stated as follows:

> Rolls-Royce has undertaken an initial investigation
> which determined no quality/workmanship issues.  In the
> millions of operational hours incurred to date across
> the fleet, <u>there has been no evidence of any trend
> impacting the 4th stage wheel</u>.

> Out of an abundance of caution, we are continuing our
> review with a new thermal transient stress analysis,
> which we expect to be complete by end of March.
> Although we do not expect this analysis to lead to any
> different conclusions, <u>I will ask my team to follow up
> with you should we have any results which would change
> our position</u>.

Pls.' Ex. X. (emphasis added).  But by this point, there had

already been three accidents (aside from the subject helicopter's

September 2008 accident) apparently caused by the fracturing of

Rolls-Royce's enhanced turbine wheels, two of which involved

enhanced Fourth Stage Wheels.  <u>See</u> Pls.' Exs. I, M, N, P, X.[27]

There is also evidence that after the 2008 crash, Windward

"repeatedly asked Rolls-Royce to be kept informed of the status

of the investigation, including any conclusions as to the cause

of the accident."  6/17/11 Shearer Decl. ¶ 26.  Rolls-Royce did

---

[27] Granted, the subject helicopter's September 2008 accident
was the only one of the five accidents (excluding Windward's 2003
accident) conclusively found by Rolls-Royce to have been LCF-
initiated.  According to Rolls-Royce, one of the other accidents
was HCF-initiated, while the "initiation mechanism" of the
remaining three accidents cannot be determined.  <u>See</u> Defs.'
6/17/11 Supp'l Filing Ex. G at 9-10 (Edney Dep.); Pls.' 6/16/11
Supp'l Statement Ex. B at 31-32 (Hunter Dep.); Pls.' Ex. U at
R2231.

    Although Rolls-Royce argues that this supports its
conclusion that the design of the enhanced Fourth Stage Wheel was
not defective, the Court notes that Rolls-Royce has admitted (1)
that the design of the enhanced Fourth Stage Wheel makes it
subject to LCF crack initiation at startup, and (2) that LCF-
initiated cracks can propagate, and ultimately lead to engine
failure, if the helicopter is operated within the 75-88% N2 speed
avoid range.  <u>See</u> Pls.' Exs. U, I; Opp'n to Motion to Strike, Ex.
A at 32-33 (Edney Dep.); <u>See</u> Pls.' 6/17/11 Supp'l Filing Ex. Y at
34-35, 43-44 (Edney Dep.); Pls.' 6/16/11 Supp'l Statement Ex. B
at 21, 31-32 (Hunter Dep.); Pls.' 6/17/11 Supp'l Filing Ex. AA at
WAI 1280.

not provide a substantive response, however, until May 22, 2009,

after Windward retained counsel who sent a demand for further

information.  See id. ¶ 26-27; Pls.' 6/17/11 Supp'l Filing Exs.

Z, AA.  And even then, Rolls-Royce provided only a summary of its

findings, and did not share its actual reports (which,

importantly, concluded that Windward likely caused HCF

propagation through its rotor balancing).  See 6/17/11 Shearer

Decl. ¶ 27; Pls.' 6/17/11 Supp'l Filing Ex. AA; Pls.' Ex. I at

428-29.[28/]

In sum, the Court finds that equitable tolling of the

limitations period is appropriate, and thus Rolls-Royce is not

---

[28/] By contrast, the Court is not persuaded that tolling is warranted on the ground that Rolls-Royce fraudulently concealed the existence of breach of implied warranty claims that Rolls-Royce knew about.

"Plaintiffs carry the burden of pleading and proving fraudulent concealment.  Plaintiffs must plead facts showing that Defendants affirmatively misled them, and that Plaintiffs had neither actual nor constructive knowledge of the facts giving rise to their claims."  Mroz v. Hoaloha Na Eha, Inc., 360 F. Supp. 2d 1122, 1131 (citing Conmar Corp. v. Mitsui & Co., 858 F.2d 499, 502 (9th Cir. 1988)); see also Marzan v. Bank of America, Civ. No. 10-00581 JMS-BMK, 2011 WL 915574, at *6 (D. Haw. Mar. 10, 2011) ("Where the basis of equitable tolling is fraudulent concealment, it must be pled with particularity under Rule 9(b) of the Federal Rules of Civil Procedure." (citing Orange St. Partners v. Arnold, 179 F.3d 656, 662 (9th Cir. 1999))); Nakamoto v. Hartley, 758 F. Supp. 1357, 1364 (D. Haw. 1991) (discussing equitable tolling based on fraudulent concealment).  Plaintiffs' complaint, however, contains no allegations about Rolls-Royce's December 2006 and August 2007 commercial engine bulletins or its March 12, 2009 letter.

entitled to summary judgment with regard to Plaintiffs' breach of implied warranty claims.[29/]

## C.        Intentional and Negligent Misrepresentation (Claims III and IV)

Defendants argue that Plaintiffs' intentional and negligent misrepresentation claims fail as a matter of law because they are based on general allegations and/or speculation. Motion at 12-14.  The Court agrees that Plaintiffs' intentional misrepresentation claims fail as a matter of law, but finds that Plaintiffs' negligent misrepresentation claims survive summary judgment.[30/]

To prove a claim of intentional misrepresentation, a plaintiff must establish that: "'(1) false representations were made by defendants, (2) with knowledge of their falsity (or without knowledge of their truth or falsity), (3) in contemplation of plaintiff's reliance upon these false representations, and [that] (4) plaintiff did rely upon them.'" Shoppe v. Gucci America, Inc., 94 Hawai'i 368, 386, 14 P.3d 1049, 1067 (2000) (citation omitted).  A claim for "[n]egligent

---

[29/] Although the complaint states that the breach of implied warranty claims are "against all defendants," Plaintiffs' opposition memorandum addresses Rolls-Royce's alleged breach of implied warranty only.  Accordingly, the Court dismisses Plaintiffs' breach of implied warranty claims with respect to Rolls-Royce Engine Services.

[30/] The Court notes that Defendants do not argue that any of Plaintiffs' misrepresentation claims are time-barred.

misrepresentation requires that: (1) false information be
supplied as a result of the failure to exercise reasonable care
or competence in communicating the information; (2) the person
for whose benefit the information is supplied suffered the loss;
and (3) the recipient relies upon the misrepresentation." Blair
v. Ing, 95 Hawai'i 247, 269, 21 P.3d 452, 474 (2001).

Plaintiffs base their misrepresentation claims on six
of Defendants' representations. The Court finds that three of
these representations support negligent misrepresentation claims
and the other three are not actionable.

First, Plaintiffs contend that Defendants intentionally
and negligently misrepresented "that the subject engine, and/or
each and every component part thereof over which [Defendants] had
designed, manufactured, fabricated, assembled, tested,
distributed, sold, inspected, maintained and/or marketed, were
fit for the purpose for which it was to be used and [were] free
from design and manufacturing defects." Compl. ¶¶ 29, 33.
Further, Plaintiffs contend that Rolls-Royce misrepresented that
the enhanced Fourth Stage Wheel would result in improved
performance. 5/23/11 Shearer Decl. ¶ 4; 6/17/11 Shearer Decl.
¶¶ 9, 11. The Court finds that Plaintiffs have come forward with
"significant probative evidence" that such representations - made
by Rolls-Royce - constitute negligent misrepresentations. See

T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citation omitted).

Plaintiffs present evidence (1) that Rolls-Royce represented that its "power turbine product improvement package" was fit for the purpose for which it would be used, was free from defects, and would result in optimized performance; (2) that Windward relied on such representations; and (3) that such representations were false, and supplied due to Defendants' failure to exercise reasonable care or competence. See Pls.' Ex. D; 5/23/11 Shearer Decl. ¶ 4; 6/17/11 Shearer Decl. ¶¶ 9, 11. In particular, Plaintiffs present evidence that due to its design, Rolls-Royce's enhanced turbine wheels - unlike its non-enhanced turbine wheels - are subject to LCF crack initiation at startup, and that such LCF cracks could thereafter propagate and cause engine failure. See Pls.' Ex. U; Opp'n to Motion to Strike, Ex. A at 32-33 (Edney Dep.); Pls.' 6/16/11 Supp'l Statement Ex. B at 21, 31-32 (Hunter Dep.); Pls.' 6/17/11 Supp'l Filing Ex. AA at WAI 1280.

On the other hand, the Court finds that Plaintiffs have not come forward with "significant probative evidence" that in 2000 and/or 2003, Rolls-Royce had knowledge of the falsity (or lacked knowledge of the truth or falsity) of its representations that the "power turbine product improvement package" was fit for the purpose for which it would be used, was free from defects,

and would result in optimized performance.  See T.W. Elec. Serv.,
809 F.2d at 630 (citation omitted).  Notably, evidence suggests
that Rolls-Royce's 1999 analyses of its enhanced power turbines
did not reveal LCF crack initiation at startup because those
analyses relied on less sophisticated models than those that are
now practicable.  See Opp'n to Motion to Strike, Ex. A at 32-33,
47 (Edney Dep.); Pls.' 6/17/11 Supp'l Filing Ex. Y at 21 (Edney
Dep.).

Second, Plaintiffs contend that Windward relied on
Rolls-Royce's December 2006 and August 2007 commercial engine
bulletins, which, according to Plaintiffs, intentionally and
negligently misrepresented that by avoiding steady state
operation in the 75-88% N2 speed avoid range, helicopter
operators would prevent engine failure caused by HCF crack
propagation.  See Opp'n at 38-39; 5/23/11 Shearer Decl. ¶ 9;
6/17/11 Shearer Decl. ¶¶ 21-24; Pls.' Exs. J, K.  The Court finds
that Plaintiffs have come forward with "significant probative
evidence" that such representations constitute negligent
misrepresentations.  See T.W. Elec., 809 F.2d at 630 (citation
omitted).

Although Defendants urge that crack propagation can
occur only within the N2 speed avoid range specified in their
commercial engine bulletins, Plaintiffs provide evidence that
they have not operated the subject helicopter in that range, yet

41

propagation still occurred. See Opp'n to Motion to Strike, Ex. A at 37 (Edney Dep.); Pls.' 6/16/11 Supp'l Statement Ex. B at 22 (Hunter Dep.); Pls.' Ex. I at R428; 6/17/11 Shearer Decl. ¶¶ 21-24. Plaintiffs also provide evidence that in October 2007, a Columbus Police Department helicopter crashed due to HCF crack propagation in the enhanced Fourth Stage Wheel notwithstanding the helicopter operator's claim that it had adhered to Rolls-Royce's "specified speed avoidance range during all flight and maintenance operations." Pls.' Ex. O at 3. Lastly, Plaintiffs provide evidence that Rolls-Royce erroneously concluded that Windward's 2003 helicopter crash likely resulted because Windward had conducted numerous tail rotor balancings at 80% N2 for more than sixty seconds each time, thus propagating cracks; but the Windward helicopter that crashed in 2003 (like the one that crashed in 2008) had a two-bladed tail rotor that required balancing (and was balanced) at 70% N2. See 6/17/11 Shearer Decl. ¶¶ 21-24; Pls.' Exs. I at 428-29, L.[31/]

_____

[31/] On the other hand, the Columbus Police Department helicopter that crashed in 2007 apparently had a four-bladed tail rotor, which presumably required balancing at 80% N2; within the speed avoidance range. See Pls.' Exs. I at R428, L, O. The Court notes that at the hearing, Defendants' counsel stated that Rolls-Royce's warning to avoid steady state operation in the 75-88% N2 speed avoid range correctly applied to helicopters with two-bladed tail rotors as well as those with four-bladed tail rotors. Although it appears that Rolls-Royce intended its warnings to be followed by helicopters with both two and four-bladed tail rotors, it is not clear from the record whether Rolls-Royce erred in failing to account for the different types
(continued...)

By contrast, the Court finds that Plaintiffs have not come forward with "significant probative evidence" that Rolls-Royce had knowledge of the falsity (or lacked knowledge of the truth or falsity) of its representations that by avoiding steady state operation in the 75-88% N2 speed avoid range, helicopter operators would prevent engine failure caused by HCF crack propagation. The evidence that Plaintiffs offer regarding these representations supports a negligent misrepresentation claim only. See 5/23/11 Shearer Decl. ¶¶ 8-9 (discussing Rolls-Royce's conclusion that Windward caused the 2003 helicopter crash by operating the helicopter within the 75-88% N2 speed avoid range); 6/17/11 Shearer Decl. ¶¶ 23-24 (stating that Rolls-Royce's conclusion regarding the 2003 crash was "in error," and suggesting that Rolls-Royce's commercial engine bulletin warning was "a negligent misrepresentation"). Indeed, Plaintiffs themselves state that "Rolls-Royce believed that the small cracks could only develop into cracks large enough to fracture the airfoils if the helicopter was operated in the 75-88% N2 speed avoidance range," and for that reason "chose not to fix the problem or to warn users about the design problem." Opp'n at 15-

---

[31]/(...continued)
of tail rotors in making their speed avoidance calculations. See Pls.' Exs. I-K; 6/17/11 Supp'l Filing Ex. Y at 40 (Edney Dep.). Notably, the parties have not provided the Court with the full transcript of the Edney deposition.

16 (citing Pls.' CSF ¶ 18 and Pls.' Ex. J) (first emphasis added).[32/]

Third, Plaintiffs contend that Rolls-Royce Engine Services negligently misrepresented "that a proper heavy maintenance inspection was performed on the subject engine and

_____

[32/] The Court recognizes that Plaintiffs also state that "Rolls-Royce knew that its enhanced power turbines were subject to LCF crack initiation at the <u>moment of startup</u>, which could propagate into failure at operating speeds <u>both within and without</u> the N2 speed avoidance range, but continued to update CEB A-1400, only warning operators to stay outside of the speed avoidance range." Opp'n at 38-39 (second emphasis added). But Plaintiffs offer no evidence that Rolls-Royce <u>knew</u> in December 2006 and/or August 2007 that crack propagation could occur even outside of the N2 speed avoidance range. Based on the record, Rolls-Royce's experts apparently believe to this day that crack propagation can occur <u>only within</u> the N2 speed avoidance range. <u>See</u> Opp'n to Motion to Strike, Ex. A at 33, 37 (Edney Dep.); <u>see also</u> Pls.' 6/16/11 Supp'l Statement Ex. B at 18, 21 (Hunter Dep.). Windward's September 2008 crash and the Columbus Police Department's October 2007 crash each took place <u>after</u> Rolls-Royce's allegedly intentional misrepresentations regarding the N2 speed avoidance range. Accordingly, that Windward contends it did not operate the subject helicopter in the N2 speed avoidance range, and that the Columbus Police Department likewise denied operating in this range, do not support Windward's argument of intentional misrepresentation.

Moreover, the Court's finding that Rolls-Royce's commercial engine bulletins warrant equitable tolling does not imply that there is a genuine issue of material fact as to whether such bulletins also constitute intentional misrepresentations. <u>See supra</u> Part II.B.2. Under Plaintiffs' theory, for the bulletins to constitute intentional misrepresentations, Rolls-Royce had to know that cracks could propagate into failure even outside of the N2 speed avoidance range (or lack knowledge about the truth or falsity of Rolls-Royce's representations). For the bulletins to constitute lulling, however, Rolls-Royce only had to take steps tending to lead Plaintiffs into inaction while the statute of limitations lapsed. Rolls-Royce's conduct could thus constitute lulling even if Rolls-Royce were correct that, based on their analyses, cracks could propagate into failure <u>only within</u> the N2 speed avoidance range.

that the 4th stage wheel was neither defective, in need of maintenance, or in need of replacement." Compl. ¶ 35. The Court finds that Plaintiffs have come forward with "significant probative evidence" in support of their position that this constitutes a negligent misrepresentation. See T.W. Elec., 809 F.2d at 630 (citation omitted).

Plaintiffs provide evidence that Windward relied on Rolls-Royce Engine Services's representation that Windward's enhanced power turbine was "found airworthy for return to service." See Pls.' Ex. G; cf. 5/23/11 Shearer Decl. ¶¶ 14-15. And as discussed above, Plaintiffs provide evidence suggesting that due to its design, the enhanced Fourth Stage Wheel is subject to LCF crack initiation at startup. Plaintiffs also provide evidence that before the August 2, 2006 inspection, the enhanced Fourth Stage Wheel had experienced 1745.6 operating hours. See Pls.' Ex. H; 6/17/11 Shearer Decl. ¶ 17. If LCF cracks may have been present at startup when the enhanced Fourth Stage Wheel was first used, LCF cracks may have been present when the August 2006 inspection was conducted, after 1745.6 hours of use. The Court finds that there is a genuine issue of material fact as to whether Rolls-Royce Engine Services negligently failed

to discover such cracks in August 2006 by failing to conduct an adequate inspection.[33]

Fourth, Plaintiffs contend that Defendants intentionally and negligently misrepresented "the maximum operating hours and maximum cycles to which the [enhanced Fourth Stage Wheel] could be subjected between service and inspection appointments under normal operating conditions without catastrophic failure." Compl. ¶¶ 30, 34; 5/23/11 Shearer Decl. ¶ 4; 6/17/11 Shearer Decl. ¶ 10. The Court finds that these representations cannot support a negligent or intentional misrepresentation claim. As discussed _supra_ Part II.B.1, "[t]here is no reasonable argument that" Defendants' representations with regard to the enhanced Fourth Stage Wheel's

---

[33] The Court recognizes that Rolls-Royce Engine Services was required, according to its guidelines, to perform only a visual inspection "for obvious cracks or damage" during the August 2, 2006 heavy maintenance inspection. See Nehls Decl. ¶ 5; Pls.' Ex. W at R309. And Plaintiffs do not offer "significant probative evidence" that obvious cracks or damage were visibly detectable at that time. Nonetheless, there is a genuine issue of material fact as to whether Rolls-Royce Engine Services was negligent in failing to conduct a more intensive heavy maintenance inspection in August 2006. For example, an inspection that utilized an "FPI" – Fluorescent Penetrant Inspection - or some other technique that was more effective than visual inspection with the naked eye. See 6/17/11 Supp'l Filing Ex. Y at 38 (Edney Dep.); see also Field v. M&B Mfg. Co., No. 94 C 5379, 1996 WL 238917, at *4 (N.D. Ill. 1996) (discussing the use of fluorescent penetrant inspections to detect welding defects). By August 2006, Rolls-Royce arguably knew that at least two helicopters had crashed due to the sudden fracturing of its enhanced power turbine wheels. See Pls.' Exs. J, I; Defs.' 6/17/11 Supp'l Filing Ex. F.

service life "state[d] a minimum life expectancy, as opposed to the maximum life expectancy, of [this] component." HDM Flugservice GmbH v. Parker Hannifin Corp., 332 F.3d 1025, 1033 (6th Cir. 2003) (affirming a district court's finding "that HDM failed to establish a genuine issue of material fact as to whether Parker's representation of the service life [of helicopter landing gear] was negligent").

Fifth, Plaintiffs contend that Rolls-Royce misrepresented to the FAA in 1999 that its enhanced power turbine design complied with 14 C.F.R. § 33.27(a). Opp'n at 38-39. It is unclear whether such representations, in Plaintiffs' view, were intentional and/or negligent. See id. In any event, the Court finds that Plaintiffs have not come forward with "significant probative evidence" in support of either position. See T.W. Elec., 809 F.2d at 630 (citation omitted).

To begin with, Plaintiffs do not offer expert testimony supporting their claim that Rolls-Royce's highly technical analyses demonstrate that the enhanced Fourth Stage Wheel violates 14 C.F.R. § 33.27(a). See Opp'n at 28; Reply at 5-6. This regulation states that "[t]he most critically stressed rotor component (except blades) of each turbine . . . as determined by analysis or other acceptable means must be tested for a period of 5 minutes" at overspeed conditions and thereafter "be within approved dimensional limits for an overspeed condition and may

not be cracked." 14 C.F.R. § 33.27(a), (c). But the gravamen of Plaintiffs' argument is that the enhanced Fourth Stage Wheel's <u>blades</u> are susceptible to LCF crack initiation at start up. Turbine blades are explicitly excluded from the requirements set forth in § 33.27.[34] Moreover, evidence suggests, as noted above, that Rolls-Royce's 1999 analyses of its enhanced power turbines did not reveal LCF crack initiation at startup because those analyses relied on less sophisticated models than those that are now practicable. As Defendants point out, it is hard to see how Rolls-Royce "failed to exercise reasonable care in supplying information to Windward [or to the FAA] years before it obtained allegedly contradictory information through field experience and currently available analytical tools." Reply at 12-13.[35]

---

[34] The Court asked Plaintiffs about this apparent flaw in their § 33.27 argument at the hearing. Plaintiffs offered no persuasive response.

[35] Persuasive authority also suggests that Plaintiffs cannot base their misrepresentation claims on Defendants' statements to the FAA. See <u>Rocky Mountain Helicopters, Inc. v. Bell Helicopter Textron, Inc.</u>, 24 F.3d 125, 132-33 (10th Cir. 1994) (holding that misrepresentation claims by an aircraft buyer seeking to recover pecuniary-loss damages could not be based on information provided pursuant to the FAA certification procedure); <u>Schroeder v. White</u>, 624 N.W.2d 810 (Minn. Ct. App. 2001) (same, with regard to negligent misrepresentation claims); <u>cf. Learjet Corp. v. Spenlinhauer</u>, 901 F.2d 198 (1st Cir. 1990) (holding that representations made to the FAA for the purpose of obtaining an airworthiness certificate could form the basis of a fraudulent misrepresentation claim, but not of a negligent misrepresentation claim).

Sixth, Plaintiffs contend that Rolls-Royce intentionally and negligently misrepresented in its "constantly updated Operations Manual . . . that the enhanced power turbine has obtained FAA certification," even though Rolls-Royce knew that to be untrue. Opp'n at 38. This representation cannot support a negligent or intentional misrepresentation claim. There is no evidence that Rolls-Royce's representation that "the enhanced power turbine has obtained FAA certification" was untrue. To the contrary, Rolls-Royce's enhanced power turbine did obtain FAA certification.

In sum, Plaintiffs' intentional misrepresentation claims fail as a matter of law. However, Plaintiffs' negligent misrepresentation claims survive summary judgment with regard to (1) Rolls-Royce's representations that the enhanced Fourth Stage Wheel was fit for the purpose for which it was to be used, free from design and manufacturing defects, and would result in improved performance; (2) Rolls-Royce Engine Services's representations "that a proper heavy maintenance inspection was performed on the subject engine and that the 4th stage wheel was neither defective, in need of maintenance, or in need of replacement"; and (3) Rolls-Royce's representations that by avoiding steady state operation in the 75-88% N2 speed avoid range, helicopter operators would prevent engine failure caused by HCF crack propagation.

**D.       Breach of Contract (Claim VI)**

Defendants argue that Plaintiffs' breach of contract claim is both time-barred and fails on the merits.  Motion at 15-16.  The Court agrees that on the merits, this claim fails as a matter of law.

Plaintiffs' complaint alleges that on August 2, 2006, Defendants negligently performed "a heavy maintenance inspection" and "either failed to detect or failed to repair the defect in the #4 turbine wheel."  Compl. ¶ 46.  Plaintiffs do not dispute that absent tolling, their contract claim would be barred by the four year statute of limitations set forth in H.R.S. § 490:2-725(1).  See Virginia Surety Co. v. American Eurocopter Corp., 955 F. Supp. 1213, 1217-18 (D. Haw. 1996) (holding that a helicopter engine manufacturer's servicing of an engine was subject to Hawai'i statutes governing the sale of goods).  Instead, Plaintiffs argue that the limitations period should be tolled (1) pursuant to the discovery rule and (2) because Rolls-Royce lulled Windward into believing that the engine inspection "was not a potential cause or contributor to the ultimate failure" (which, presumably, delayed Windward's filing of this action).  Opp'n at 41-42.

For the reasons discussed supra Section II.B.2, the Court finds that there is a possibility that Plaintiffs could show that Rolls-Royce lulled Plaintiffs into inaction.  See

Mauian Hotel, Inc. v. Maui Pineapple Co., 52 Hawai'i 582, 570-71, 481 P.2d 310, 315 (1971) (discussing equitable tolling based on lulling).  Accordingly, the Court cannot find that Plaintiffs' breach of contract claim is time-barred as a matter of law.  See Cunha v. Ward Foods, Inc., 501 F. Supp. 830, 836 (D. Haw. 1980).

Nonetheless, the Court finds that Plaintiffs' breach of contract claim fails on the merits.  In their summary judgment motion, Defendants argue that "Plaintiffs have not identified a breach of any specific term under either contract."  Motion at 15.  But Plaintiffs ignore this argument, and fail to come forward with "significant probative evidence" supporting their breach of contract claim.  See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citation omitted).  Indeed, Plaintiffs do not provide the Court with any of the contracts between the parties, nor do they even discuss the terms of such contracts.  And as Defendants further point out, Rolls-Royce Engine Services was required, according to its guidelines, to perform only a visual inspection "for obvious cracks or damage" during the August 2, 2006 heavy maintenance inspection, and Plaintiffs do not offer "significant probative evidence" that obvious cracks or damage were visibly detectable at that time.  See Reply at 13-14; see also Nehls Decl. ¶ 5 (stating that the heavy maintenance inspection required Rolls-Royce Engine Services, "[w]ithout further disassembly, [to]

51

visually inspect the third and fourth stage turbine wheels for

obvious cracks or damage."); Pls.' Ex. W at R309 (same).

In sum, Plaintiffs' breach of contract claim fails as a

matter of law.[36/]

**E.      Unfair Method of Competition (Claim VII)**

Defendants argue that Plaintiffs' unfair method of

competition claim fails as a matter of law because Plaintiffs do

not explain how representations regarding the enhanced Fourth

Stage Wheel (1) affect competition in Hawai'i and/or (2)

constitute unfair acts.  Motion at 16-18.  The Court agrees that

Plaintiffs' claim fails as a matter of law because Plaintiffs

have not alleged the nature of the competition or come forward

with evidence supporting such competition.

Hawaii's Deceptive Practices Act makes unlawful

practices that are "'likely to mislead consumers acting

reasonably under the circumstances.' " <u>Courbat v. Dahana Ranch,

Inc.</u>, 111 Hawai'i 254, 262, 141 P.3d 427, 435 (2006) (citation

omitted).  "Only consumers, the attorney general, or the director

of the office of consumer protection are authorized to bring an

action based on unfair or deceptive acts or practices.  HRS

_____

[36/] Although the complaint states that the breach of contract
claim is "against all defendants," Plaintiffs' opposition
memorandum addresses Rolls-Royce Engine Services's alleged breach
of contract only.  The Court dismisses Plaintiffs' breach of
contract claim with respect to Rolls-Royce for this reason as
well as those discussed above.

§ 480-2(d). Actions based on unfair methods of competition, on the other hand, are not so limited." <u>Davis v. Four Seasons Hotel Ltd.</u>, 122 Hawaiʻi 423, 434-35, 228 P.3d 303, 314-15 (2010). Plaintiffs assert an unfair method of competition claim based on § 480-2(e), which provides that "[a]ny person may bring an action based on unfair methods of competition declared unlawful by this section." H.R.S. § 480-2(e).

In order to state a cause of action pursuant to § 480-2(e) and recover money damages, a plaintiff must establish "(1) a violation of HRS Chapter 480; (2) which causes injury to the plaintiffs' business or property; and (3) proof of the amount of damages." <u>Davis</u>, 122 Hawaiʻi at 434-35, 228 P.3d at 314-15. "[A] plaintiff 'may bring claims of unfair methods of competition based on conduct that would also support claims of unfair or deceptive acts or practices. In doing so, however, '<u>the nature of the competition [must be] sufficiently alleged in the complaint</u>.'" <u>Id.</u> at 435, 228 P.3d at 315 (citations omitted; emphasis in original). Demonstrating the existence of competition is key to an unfair method of competition claim. <u>See id.</u> at 437 n.26, 228 P.3d at 317 n.26 (citation omitted). In <u>Davis</u>, the Hawaiʻi Supreme Court emphasized that the plaintiffs were "required to allege how [the defendant's] conduct will negatively affect competition in order to recover on an unfair methods of competition claim," and found that the plaintiffs'

complaint "clearly d[id] not contain any allegations concerning the nature of the competition." Id. at 437-38, 228 P.3d at 317-18; see also Wadsworth v. KSL Grand Wailea Resort, Inc., Civ. No. 08-00527 ACK-LEK, 2010 WL 5146521, at *21-26 (D. Haw. Dec. 10, 2010) (finding that plaintiffs had failed to adequately "allege the nature of the competition as required by the court in Davis").

Here, Plaintiffs' complaint alleges that Defendants "expressly and/or impliedly represented that there would be certain economic and other intangible benefits and advantages by purchasing and servicing the subject 4th Stage Wheel from and by Defendants." Compl. ¶ 49. It also alleges that the subject part failed, causing damage to the subject helicopter and engine, and that "Defendants failed to fulfill their representations," which constituted an unfair method of competition. Id. ¶ 51. But the complaint does not contain a single allegation addressing how Defendants' conduct will negatively affect competition. See Davis, 122 Hawai'i at 437-38, 228 P.3d at 317-18; Wadsworth, 2010 WL 5146521, at *23-24. Defendants' motion for summary judgment points out this shortcoming, but Plaintiffs offer no persuasive response. And Plaintiffs' supplemental papers ignore this deficiency entirely, even though the Court addressed it at the hearing.

Plaintiffs' opposition memorandum expands upon the complaint's unfair method of competition theory by arguing that Rolls-Royce abused its market position by discontinuing manufacture of its unenhanced turbine wheels, "effectively requiring all operators of 369D helicopters and M250-C20B engines to utilize its 'enhanced' fourth state wheels," all the while "knowing that the design of the enhanced turbine wheels [was] defective." Opp'n at 43; see also Opp'n to Motion to Strike, Ex. A at 37 (Edney Dep.). Plaintiffs contend that such conduct "burden[ed] small operators with the costs" of replacing their enhanced turbine wheels, engines, and helicopters "when the known defect turns out to propagate" and cause helicopter crashes. Opp'n at 43-44. Plaintiffs' argument fails because harm to small operators does not constitute harm to competition for purposes of H.R.S. § 480-2(e). Cf. Wadsworth, 2010 WL 5146521, at *25 (finding that an allegation stating that hotel food and beverage servers competed with their employer for tips failed to adequately allege the nature of the competition). And the Court is similarly unpersuaded by Plaintiffs' conclusory statement that "[t]here is a clear impact on competition resulting from Rolls-Royce's abuse of its market position." Opp'n at 44.

In sum, Plaintiffs' unfair competition claim fails as a matter of law.

55

**F.        Res Ipsa Loquitur (Claim VIII)**

Defendants argue that Plaintiffs' claim based on res ipsa loquitur should be dismissed because it is duplicative of their negligence and strict products liability claims and it is barred by the economic loss rule.  Defendants also argue that the doctrine is not applicable here.  Motion at 18-19.  The Court agrees that this claim fails as an independent claim and that the doctrine of res ipsa loquitur is not properly invoked.[37/]

As the court held in Rodriquez v. General Dynamics Armament and Technical Products, Inc., 696 F. Supp. 2d 1163 (D. Haw. 2010), the doctrine of res ipsa loquitur "is a manner in which negligence and strict liability may be proven, not an independent claim."  Id. at 1182.  A purported res ipsa loquitur claim that duplicates negligence and/or strict products liability claims thus warrants dismissal to "prevent possible jury confusion and a potential double recovery."  Id.  In Rodriquez, the court dismissed the plaintiffs' res ipsa loquitur claim, although ruled that the plaintiffs could rely on res ipsa loquitur in seeking to prove their negligence or strict liability claims.  Id.  Unlike in Rodriquez, res ipsa loquitur is not appropriate here.

_____

[37/]   As discussed supra Part II.A, the Court finds that the economic loss rule does not bar Plaintiffs' negligence or strict liability claims as a matter of law.  Accordingly, neither does it bar Plaintiffs' use of the doctrine of res ipsa loquitur as a matter of law.

For a plaintiff to properly invoke res ipsa loquitur, which raises a rebuttable inference allowing the plaintiff to get his case to the jury (and thus avoid a directed verdict against him), the plaintiff must first establish that the accident was: (1) "one which ordinarily does not occur in the absence of someone's negligence"; (2) "caused by an agency or instrumentality within the exclusive control of the defendant"; and (3) not "due to any voluntary action or contribution on the part of the plaintiff." Carlos v. MTL, Inc., 77 Hawai'i 269, 277-78, 280, 883 P.2d 691, 699-700, 702 (Ct. App. 1994). Plaintiffs cannot rely on res ipsa loquitur at trial because they fail to satisfy the first and second elements.

To establish the first element, "'the event must be such that, in the light of ordinary experience, gives rise to an inference that someone must have been negligent.' In other words, a plaintiff must show that the event is 'of a type that normally does not occur unless someone has been negligent.'" Rodriquez, 696 F. Supp. 2d at 1182-83 (citing Carlos, 77 Hawai'i at 278, 883 P.2d at 700). "Hawaii courts have declined to apply the doctrine when a layperson factfinder would lack competence to conclude, based on common knowledge, that the alleged damage would not have occurred had the defendant exercised proper skill or care." Id. at 1182.

In Rodriguez, the court found the first element satisfied based on expert testimony that an allegedly defective mortar's explosion "was not something that normally occurs absent some negligence - either human error or a defect in the cartridge." Id. at 1183. Here, by contrast, Plaintiffs offer no expert testimony - indeed, no evidence at all - to support the complaint's allegation that sudden fracturing of the enhanced Fourth Stage Wheel would not normally occur absent negligence on the Defendants' (or someone's) part. Compl. ¶ 57. The Court agrees with Defendants "that res ipsa loquitur is inapplicable to the complex technical causation issues in this case, for which Plaintiffs have offered no expert testimony in opposition." Reply at 15.

To establish the second element of res ipsa loquitur, a plaintiff must "trace the injury received to a cause or specific instrumentality for which the defendant was responsible, or to show that the defendant was responsible for all reasonable probable causes to which the accident could be attributed. Whether the plaintiff has sustained this burden is a question of fact, unless the evidence is uncontradicted and does not permit varying inferences." Carlos, 77 Hawai'i at 279, 883 P.2d at 701 (citations omitted). In particular, a plaintiff satisfies the exclusive control requirement by showing that the accident "was caused by an agency or instrumentality in the exclusive control

of the defendant originally, and which was not mishandled or otherwise changed after defendant relinquished control." <u>Jenkins v. Whittaker Corp.</u>, 785 F.2d 720, 730-31 & n.25 (9th Cir. 1986) (quotation marks omitted); California Civil Jury Instruction No. 4.00; <u>see also</u> <u>Rodriguez</u>, 696 F. Supp. 2d at 1183.

In <u>Rodriguez</u>, the court found that the plaintiffs could avoid summary judgment as to the exclusive control element based on "evidence that the mortar cartridge was unchanged between the time of its production and the time of its use." 696 F. Supp. 2d at 1183 (citing deposition testimony that "[a] round within the mortar pack is likely to pretty much stay just the way it was as it came out of the plant"). As Defendants argue, the case at bar is distinguishable from <u>Rodriguez</u>: "Unlike the mortar pack in the <u>Rodriguez</u> case, which is obviously used only once when it is fired in a mortar, the Fourth Stage Wheel was used continually by and under the direct control of Windward." Reply at 15. And in addition to Windward's using the enhanced Fourth Stage Wheel for more than two years after Rolls-Royce Engine Services relinquished control of it in August 2006, Windward also had the subject engine, which contained the subject turbine assembly and enhanced Fourth Stage Wheel, installed into the subject hull (by a third party) in November 2007. Plaintiffs fail to show that the enhanced Fourth Stage Wheel "was not mishandled or otherwise changed" during this installation or at any other time after

Defendants relinquished control of the part.  <u>Jenkins</u>, 785 F.2d at 730 n.25 (quotation marks omitted); <u>see also</u> <u>Petroleum Helicopters, Inc. v. Rolls-Royce Corp.</u>, 2007 WL 2249118, at *11-12 (S.D. Ind. Aug. 2, 2007) (finding that a plaintiff failed to satisfy the exclusive control element in part because it was "possible that [the allegedly defective helicopter component] could have been mishandled or subject to thermal shock during various removals and reinstallations"); <u>Cadwell v. Gen. Motors Corp.</u>, No. 5:04-CV-72(WDO), 2006 WL 208858, at *4 (M.D. Ga. Jan. 25, 2006) (rejecting the application of res ipsa loquitur based on an allegedly defective automobile braking system where the plaintiff "failed to show that GM owned, operated, maintained, controlled or was responsible for the management and maintenance of her particular vehicle that was seven years old at the time of the accident").

In sum, the Court dismisses Plaintiffs' res ipsa loquitur claim and finds that Plaintiffs cannot rely on this doctrine at trial.

**G.      Conversion (Claim IX)**

Defendants argue that Plaintiffs' conversion claim fails as a matter of law because (1) Rolls-Royce's records indicate that "all of the parts [that] were received for investigation were returned shipped to Windward and/or DallasAirmotive" and (2) Plaintiffs fail to allege that they

suffered actual damages as a result of Rolls-Royce's failure to
return the failed components.  Motion at 19-20.  The Court is
unpersuaded, and finds that there is a genuine issue of material
fact as to whether Rolls-Royce converted Windward's property.

In Tsuru v. Bayer, 25 Haw. 693, 1920 WL 830 (Haw. Terr.
1920), the Supreme Court of the Territory of Hawai'i explained
that "[c]onversion is any distinct act of dominion wrongfully
exerted over another's personal property in denial of or
inconsistent with his rights therein, such as a tortious taking
of another's chattels, or any wrongful exercise or assumption of
authority, personally or by procurement, over another's goods,
depriving him of the possession permanently or for an indefinite
time.  Id. at *2.  To prove a claim for conversion, an owner of
property must establish "'(1) [a] taking from the owner without
his consent; (2) an unwarranted assumption of ownership; (3) an
illegal use or abuse of the chattel; and (4) a wrongful detention
after demand.'"  Id. (citation omitted).  "[W]here the original
taking is lawful and there has been no illegal assumption of
ownership or illegal [use,] a demand and refusal must be shown as
evidence of a disposition to convert to the holder's own use or
to divest the true owner of his property."  Id.; see also Sung v.
Hamilton, 710 F. Supp. 2d 1036, 1043-44 (D. Haw. 2010)
(discussing the tort of conversion under Hawai'i law); Pourny v.

<u>Maui Police Dep't</u>, 127 F. Supp. 2d 1129, 1146 (D. Haw. 2000) (same).

Plaintiffs' complaint alleges that although Windward demanded on April 27, 2009, that Rolls-Royce return all of Windward's engine parts, Rolls-Royce has not returned "the PC Air Filter, Double Check Valve, Accumulator, Turbine to Compressor Coupling and Turbine Shaft to Pinion Gear Coupling." Compl. ¶ 61. It further alleges that Plaintiffs have thereby sustained a loss of these parts and "have also been unable to conduct an analysis of the failed components and a thorough investigation of the crash-landing." <u>Id.</u> ¶ 62.

Based on the record now before the Court, the Court finds that there is a genuine issue of material fact as to whether Rolls-Royce returned Windward's property. Rolls-Royce provides evidence that it (1) complied with Windward's Fall 2008 request that Rolls-Royce ship certain engine parts to an entity called Dallas Airmotive and (2) returned the remaining parts directly to Windward in August 2009. <u>See</u> Hunter Decl. ¶ 6; Defs.' 6/17/11 Supp'l Filing Exs. E at 108-14 (Hunter Dep.), H, I, K. In response, Plaintiffs provide evidence that Rolls-Royce has not returned myriad engine parts to Windward. <u>See</u> 6/17/11 Shearer Decl. ¶ 28.

The Court is unpersuaded by Defendants' argument that Plaintiffs' conversion claim fails because Plaintiffs have not

alleged that they suffered actual damages as a result of Rolls-Royce's failure to return the engine parts. Motion at 19-20. As noted above, conversion is defined broadly under Hawai'i law as "any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with his rights therein." Tsuru, 25 Haw. 693, 1920 WL 830 at *2; see also Pourny, 127 F. Supp. 2d at 1146. Defendants' alleged conduct satisfies this definition. And in any event, Windward has indeed alleged and provided evidence that it has suffered actual damage as a result of not having its parts returned. See Compl. ¶ 62; Pls.' 6/17/11 Supp'l Filing Ex. Z at WAI 1290 (letter requesting that Rolls-Royce safeguard the physical evidence of the engine components "so that Windward will not be precluded or prejudiced from having its own expert analysis of the failed parts performed"); cf. Pls.' 6/16/11 Supp'l Statement Ex. B. at 29 (stating that the only engine parts belonging to Windward that Rolls-Royce likely disposed of were "throw-away items" that "would not be reused, anyway") (Hunter Dep.).

In sum, Rolls-Royce is not entitled to summary judgment with regard to Plaintiffs' conversion claim.[38/]

_____

[38/] Although the complaint states that Plaintiffs' conversion claim is "against all defendants," the allegations of conversion address only Rolls-Royce's conduct. Likewise, Plaintiffs' opposition memorandum states that there is "a genuine issue of material fact in dispute whether Rolls-Royce returned all of the parts to Windward Aviation following its tear down inspection."
(continued...)

**H.        Subrogation (Claim X)**

Defendants argue that Plaintiffs' subrogation claim fails as a matter of law because the plaintiff insurers can recover only in tort, but Plaintiffs' tort claims are barred by the economic loss rule.  Motion at 20-21.  Because the Court has rejected Defendants' argument that the economic loss rule bars Plaintiffs' tort claims, Defendants' argument with respect to the subrogation claim is unpersuasive.  Defendants are not entitled to summary judgment as to this claim.

**CONCLUSION**

For the foregoing reasons, the Court DENIES Defendants' motion to strike and GRANTS IN PART and DENIES IN PART Defendants' motion for summary judgment.

In particular, the Court (1) GRANTS summary judgment with respect to the express warranty claims (Claim II), implied warranty claims against Rolls-Royce Engine Services (Claim II), intentional misrepresentation claims (Claim III), breach of contract claim (Claim VI), unfair method of competition claim (Claim VII), res ipsa loquitur claim (Claim VII), and conversion claim against Rolls-Royce Engine Services (Claim IX); and (2) DENIES summary judgment with respect to the negligence claim

---

[38]/(...continued)
Opp'n at 46 (emphasis added).  Accordingly, the Court dismisses Plaintiffs' conversion claim with respect to Rolls-Royce Engine Services.

(Claim I), implied warranty claims against Rolls-Royce (Claim II), negligent misrepresentation claims (Claim IV), strict products liability claim (Claim V), conversion claim against Rolls-Royce (Claim IX), and subrogation claim (Claim X).

IT IS SO ORDERED.

Dated: Honolulu, Hawai'i, July 6, 2011.



_____
Alan C. Kay
Sr. United States District Judge

Windward Aviation Inc. et al. v. Rolls-Royce Corporation et al., Civ. No. 10-00542 ACK-BMK, Order Denying Defendants' Motion to Strike and Granting in Part and Denying in Part Defendants' Motion for Summary Judgment.